FILED - U.S.C - NH
2025 JUL 14 11:12:23

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW HAMPSHIRE**

Richard M. Greeley

2 McElroy Street Goffstown, NH 03045

richgreeley93@gmail.com

(603) 268-1742

Plaintiff,

v.

New Hampshire State Police (NHSP);

Trooper Derek Myrdek, in his individual capacity;

Sergeant Mark Barrett, in his individual capacity;

Trooper Brian Taylor, in his individual capacity;

Trooper Brian Kneil, in his individual capacity;

Trooper Conor Davis, in his individual capacity;

Unknown Officers of the Bow Police Department, in their individual capacities,

Defendants.

**COMPLAINT FOR DAMAGES**

**(42 U.S.C. § 1983 - Civil Rights Violations and Related State Claims)**

**I. JURISDICTION AND VENUE**

1. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.
2. Supplemental jurisdiction over state law claims is conferred by 28 U.S.C. § 1367.

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred in Merrimack County, New Hampshire.

## II. PARTIES

4. Plaintiff Richard M. Greeley is an adult resident of Goffstown, New Hampshire.
5. Defendant Trooper Derek Myrdek is a member of the NHSP who, at all relevant times, acted under color of state law.
6. Defendant Sergeant Mark Barrett is a supervisory Trooper with the NHSP who acted under color of law at all times relevant.
7. Defendant Trooper Brian Taylor is a member of the NHSP who arrived on scene and acted under color of law.
8. Defendant Trooper Brian Kneil a member of the the NHSP  who arrived post-incident. His body camera appeared to function properly, and he conducted himself professionally.
9. Defendant Trooper Conor Davis is member NHSP who arrived following the attack and acted under color of law.
10. Defendants John Does 1-X are unidentified officers from the Bow Police Department and or other undetified law enforcement personell.

## III. FACTUAL ALLEGATIONS

11. Plaintiff came to a complete stop at a stop sign in Bow, New Hampshire. After signaling appropriately, he made a lawful right-hand turn.
12. Immediately after turning, Plaintiff observed flashing blue emergency lights activate behind him. Although he had committed no apparent infraction, Plaintiff panicked and accelerated. The police vehicle behind him gave chase and increased its speed as well.

12A. In his official incident report, Trooper Myrdek stated that he deployed and prolonged the use of the K9 in part because Plaintiff was **"significantly larger than me"** and **"was wearing a Support 81 T-shirt. Based upon my training and experience I know the number 81 represents the Hells Angels"** This admission indicates that the force used was not based on any objective safety assessment or immediate threat but instead motivated by Plaintiff's physical appearance and perceived associations. Such reasoning reflects constitutionally impermissible bias and supports a finding of malice, discrimination, and retaliatory animus under the Fourth and Fourteenth Amendments.

13. Plaintiff has resided in New Hampshire for the majority of his life and has done so continuously since obtaining his driver's license. He was familiar with the roads in

the area and had initially made a U-turn after realizing he was heading in the wrong direction.

14. Upon completing the U-turn, Plaintiff observed for the first time that the pursuing vehicle was marked as a NHSP cruiser. The uniformed Trooper driving the cruiser appeared hostile towards me.

15. Believing that he had already made a serious mistake by not stopping immediately when the emergency lights were activated, and perceiving the Trooper's expression as hostile, Plaintiff became increasingly fearful. He was unable to think of any reason why he would be the subject of a pursuit.

16. Still in a heightened state of fear, Plaintiff turned onto a dead-end street and brought his vehicle to a stop, the way forward blocked by a plowed snowbank. The State Police cruiser stopped directly behind him.

17. The Trooper immediately exited his cruiser and began shouting commands for Plaintiff to exit the vehicle and raise his hands. Plaintiff complied fully, stepping out of the vehicle with both hands raised and palms clearly visible, signaling that he was unarmed and non-threatening.

18. Almost immediately upon exiting, Plaintiff was struck in the side by a police K9, later identified as "Ragnar," which had been deployed by the pursuing officer, now identified as Trooper Derek Myrdek of the NHSP. The K9 bit Plaintiff in the stomach—a vulnerable and non-extremity area—causing excruciating pain and **forcing him to the ground violently**.

19. Despite the severity of the attack, Plaintiff did not resist, reach for the dog, or attempt to flee. He remained with his hands up in a posture of full compliance. Plaintiff was told to roll on his stomach and was fully compliant. Trooper Myrdek approached and placed a knee on Plaintiff's back, ordering him to put his hands behind his back. Plaintiff informed Myrdek that the dog was causing severe pain and that he was not resisting. He repeated this several times, explicitly asking for the dog to be removed. Myrdek refused, stating that the dog would not be removed until Plaintiff was in handcuffs.

20. Sergeant Mark Barrett arrived on the scene during the continued mauling and assisted in handcuffing Plaintiff. At no point did SGT Barrett or Trooper Myrdek take action to call off the dog. Even after Plaintiff was fully restrained and lying face down in handcuffs, the dog continued to bite him. Although other Troopers and officers had arrived, only Myrdek made any effort to disengage the K9.

21. Trooper Myrdek then issued a verbal command to the dog, which did not result in release. Plaintiff believes Myrdek struck the dog with a flashlight, though he cannot confirm how many times due to the level of pain and partial loss of consciousness.

Once the dog released its grip, Plaintiff experienced some relief but remained in significant abdominal pain.

21A. Attached hereto as *Exhibit F* is a true and correct copy of the official New Hampshire State Police K-9 Incident Report, authored by Trooper Conor Davis and reviewed by Sergeant Mark Barrett. Despite the fact that Plaintiff suffered a clear and documented K-9 mauling, the report falsely states "No Deployment" and "No Bite Apprehension." This falsified report directly contradicts body-worn camera footage, medical records, and witness accounts, and serves as direct evidence of fabrication, supervisory complicity, and deliberate indifference to Plaintiff's constitutional rights.

21B. The submission of the NHSP K-9 Incident Report in this case—asserting "No Deployment" and "No Bite Apprehension"—despite the visible injuries sustained by Plaintiff and the documented mauling captured on body-worn camera footage, underscores the intent to cover up the unlawful conduct. The fact that this report was authored by Trooper Davis and reviewed and approved by Sergeant Barrett, both of whom were present after the incident, demonstrates that the false documentation was institutional rather than isolated. This deliberate misrepresentation supports Plaintiff's claims under multiple counts including excessive force, fabrication of evidence, Monell liability, and intentional infliction of emotional distress.

22. Plaintiff was lifted from the ground by Trooper Myrdek and SGT Barrett. He immediately requested medical assistance. No officer responded. Plaintiff repeated his request multiple times before Trooper Myrdek stated that an ambulance had been called. Plaintiff neither saw nor heard any communication over the radio to support this claim. After further delay, when Plaintiff again requested help, Trooper Myrdek stated, "I'm not an EMT," and declined to provide any aid.

22A In his official police report, Trooper Derek Myrdek justified his deployment of the K9 by stating that "a dog is not lethal force." This statement reveals a gross misunderstanding of established constitutional law. Federal courts—including the First Circuit—have held that police K9s are capable of inflicting serious injury or death and therefore constitute a significant level of force. Myrdek's reliance on this flawed reasoning underscores not only his personal recklessness but also a systemic failure by the New

Hampshire State Police to properly train officers in lawful use-of-force standards. His belief that the dog's use was inherently reasonable reflects deliberate indifference and contributed directly to the unjustified mauling of Plaintiff.

23. Following the incident, Plaintiff was charged with resisting arrest. These charges were allegedly supported by official reports from Trooper Myrdek and other Defendants stating that Plaintiff fled on foot and physically resisted officers.

24. However, these criminal charges were never formally processed by the prosecution, indicating that the prosecution found no credible basis for the officers' account.

25. Further, during a probable cause hearing related to these charges, held on February 28, 2024 Merrimack County District Court], Defendant Trooper Derek Myrdek provided sworn testimony regarding Plaintiff's apprehension.

25A. Trooper Myrdek's own incident report confirmed that he allowed the K9 to continue mauling Plaintiff because he was **"Much larger than me"** and wore a **"Support 81 T-shirt"** This statement demonstrates an impermissible and retaliatory motive for the use of force, unrelated to any actual threat or resistance. It directly undermines any defense of objective reasonableness and supports a finding of intentional and malicious conduct.

26. Under oath, Trooper Myrdek testified that Plaintiff "got out and ran a few feet then said like 5 feet and then was apprehended by Ragnar."

27. This sworn testimony is demonstrably false and directly contradicted by objective video evidence from Defendant Myrdek's own body-worn camera. The body camera footage unequivocally shows Plaintiff complying fully with commands, stepping out of the vehicle with both hands raised and making no attempt to flee or resist.

27A. The falsified NHSP K-9 Incident Report—authored by Trooper Davis and reviewed by Sergeant Barrett—omitted the use of force entirely and falsely asserted "No Deployment" and "No Bite Apprehension." This deliberate misrepresentation, approved by supervisors who were present after the incident, underscores the Defendants' failure to intervene and their active participation in concealing constitutional violations. It further demonstrates that the Troopers not only failed to prevent harm but also chose to protect the perpetrator and suppress the truth.

28. This false testimony, given under oath in a judicial proceeding, further supports Plaintiff's contention that the Troopers' initial reports were knowingly false and fabricated to justify the excessive force used against him and to support baseless criminal charges.

29. While standing in the doorway of his vehicle, Defendant Myrdek, without justification, deployed his K9 'Ragnar,' who violently ripped Plaintiff down and mauled him. During the incident, Trooper Myrdek was captured on video saying, "I have to secure you before I take the dog off." This statement, made directly to Plaintiff while he was being actively bitten, demonstrates a knowing and deliberate decision to prolong the attack despite Plaintiff's clear and visible surrender. The delay in calling off the dog significantly worsened Plaintiff's injuries and reflects conscious disregard for his safety.

30. As seen in Exhibits D and E, Plaintiff was already restrained in handcuffs when Sergeant Mark Barrett arrived and pressed his knee into Plaintiff's back. Simultaneously, NHSP K9 "Ragnar" remained latched onto Plaintiff's side or lower torso. Plaintiff was fully subdued, face-down on the frozen pavement, and posed no active threat or resistance. The continued deployment of the K9, along with the application of knee pressure to an already restrained person, constitutes objectively unreasonable force in violation of the Fourth Amendment.

31. Trooper Myrdek responded, "The ambulance is on the way." EMT records now confirm that EMS was called approximately 1-2 minutes after the attack. However, Plaintiff—who was bleeding and in visible distress—did not witness any immediate attempt by Trooper Myrdek to summon medical help and was left feeling abandoned and in fear for his safety.

32. When Plaintiff asked again, Trooper Myrdek said, "I can't help you, I'm not an EMT," and still made no visible effort to summon aid. This comment reflected awareness of Plaintiff's serious condition and a refusal to act.

33. The K-9 Incident Report submitted by Trooper Davis and approved by Sergeant Barrett constitutes a formal piece of fabricated evidence. Its content—categorically denying the deployment of a police dog and any resulting bite—directly conflicts with video footage, medical records, and eyewitness testimony. This fabrication, entered into the official record and used to justify Plaintiff's arrest and charges, deprived Plaintiff of a fair legal process and further compounded the constitutional violations.

34. Even after Plaintiff was restrained and defenseless, the dog continued to bite him while Troopers looked on.

35. Troopers Taylor, Kneil, and Davis arrived after the mauling but failed to render medical aid, document the use of force, or accurately report the events.

36. Multiple officers muted or disabled their body-worn cameras in violation of policy. Laughter was overheard as Plaintiff stood injured.

37. The K-9 Incident Report submitted by Trooper Davis and approved by Sergeant Barrett constitutes a formal piece of fabricated evidence. Its content—categorically denying the deployment of a police dog and any resulting bite—directly conflicts with video footage, medical records, and eyewitness testimony. This fabrication, entered into the official record and used to justify Plaintiff's arrest and charges, deprived Plaintiff of a fair legal process and further compounded the constitutional violations.

38. Trooper Kneil's body-worn camera appeared to function properly, and he conducted himself professionally.

39. Plaintiff sustained severe physical injuries, including a **ten-inch permanent scar and a five-inch diameter lump on his abdomen,** along with severe PTSD, and economic harm because of Defendants' actions and omissions.

40. After the incident involving Plaintiff, Trooper Derek Myrdek was again involved in a reported K9 deployment. According to a press release and social media reports published on or about May 30, 2021, Myrdek deployed his K9 to apprehend a suspect following a crash on I-89 South near I-93 North in Bow, New Hampshire. While the official narrative describes the subject as being "apprehended," the deployment of the K9 in a roadside crash context—again involving Myrdek—raises significant concerns regarding proportionality and policy compliance. This incident predates Plaintiff's by several years and suggests that NHSP had prior notice of Myrdek's use of force tendencies involving K9 deployments in nonviolent vehicle stops or crashes. The failure to take corrective action following that earlier incident directly enabled the conduct that caused Plaintiff's injuries.

41. The lack of immediate medical aid provided to Plaintiff was not an isolated breakdown. In at least one subsequent incident involving Trooper Myrdek's K9 deployment, similar delays in treatment were reported publicly. These patterns reinforce Plaintiff's claim that NHSP has failed to instill or enforce proper standards for post-force medical response, despite prior notice of serious harm caused by its officers.

## IV. CAUSES OF ACTION

### Count I - Excessive Force (42 U.S.C. § 1983 - Fourth Amendment)

42. The use of a K9 against an unarmed, compliant individual constituted excessive force under clearly established law.

43. Defendant Myrdek intentionally deployed the K9 without justification and failed to call it off once Plaintiff was subdued.

44. Despite observing that Plaintiff was handcuffed and being actively bitten by the K9, none of the officers on scene—including Sergeant Mark Barrett, Troopers Taylor, Kneil, and Davis—made any reasonable attempt to intervene or de-escalate. Their collective inaction in the face of a clearly excessive and unconstitutional use of force rendered each liable for failure to intervene.

45. These actions violated Plaintiff's rights under the Fourth Amendment. This unconstitutional use of force by Trooper Myrdek is consistent with at least two other known incidents—one predating and one following the attack on Plaintiff—where he deployed a K9 against individuals in crash-related roadside encounters.

   **45 A** Additionally, Trooper Myrdek stated in his official report that "a dog is not lethal force," revealing a fundamental misunderstanding of clearly established constitutional law. Federal courts have long held that police dogs, by their very nature and training, constitute a significant use of force subject to strict Fourth Amendment scrutiny. Myrdek's flawed justification further highlights the unreasonableness of his actions and reflects a systemic failure by NHSP to ensure Troopers are properly trained in use-of-force standards.

**45B.** The fact that Trooper Myrdek was involved in another K9 deployment on January 23, 2025—after the February 17, 2024 mauling of Plaintiff—reinforces the unreasonableness of NHSP's continued authorization of his use-of-force discretion. This subsequent incident reflects that Myrdek was neither disciplined nor retrained, and it supports the inference that the excessive force used on Plaintiff was part of an ongoing pattern of misconduct rather than a one-time lapse in judgment.

Then continue with:

Authorities:

- Graham v. Connor, 490 U.S. 386 (1985)
- Tennessee v. Garner, 471 U.S. 1 (1985)
- Kingsley v. Hendrickson, 576 U.S. 389 (2015)
- Raiche v. Pietroski, 623 F.3d 30 (1st Cir. 2010)
- Jennings v. Jones, 499 F.3d 2 (1st Cir. 2007)

**Count II - Failure to Intervene (42 U.S.C. § 1983)**

46. Each Defendant had a reasonable opportunity to prevent or mitigate the unlawful conduct but failed to act.
47. Their omissions enabled the constitutional violations and exacerbated Plaintiff's injuries.

Authorities:

- Gaudreault v. Salem, 923 F.2d 203 (1st Cir. 1990)
- Martinez v. Colon, 54 F.3d 980 (1st Cir. 1995)
- Wilson v. Town of Mendon, 294 F.3d 1 (1st Cir. 2002)
- Sanchez v. Pereira-Castillo, 590 F.3d 31 (1st Cir. 2009)
- Roguz v. Walsh, No. 3:11-cv-1052 (D. Conn. 2015)

# Count III - Fabrication of Evidence / False Reporting (42 U.S.C. § 1983 - Fourteenth Amendment)

47. Defendants knowingly authored and submitted materially false incident reports claiming that Plaintiff fled on foot, resisted arrest, and posed a threat requiring the deployment of a police K9. These statements were false when made and were intended to justify the excessive force used against Plaintiff.
48. Body-worn camera footage, witness observations, and physical evidence establish that Plaintiff exited his vehicle with both hands raised, made no attempt to flee, and complied fully with all commands. No physical resistance occurred.
49. The psychological harm inflicted on Plaintiff was magnified by the fact that Trooper Myrdek later justified the prolonged K9 mauling by referencing Plaintiff's physical size and the clothing he wore. The clear implication was that Plaintiff was punished for his appearance, not his actions—causing lasting humiliation, fear of profiling, and deeply rooted emotional trauma.
50. Despite this clear evidence, Defendants submitted official reports misrepresenting Plaintiff's conduct and, significantly, Trooper Derek Myrdek provided sworn false testimony at the probable cause hearing on or around February 28, 2025, that Plaintiff "got out and ran a few feet then said like 5 feet and then was apprehended by Ragnar."

51. The false K-9 Incident Report submitted by Trooper Davis and approved by Sergeant Barrett, which completely denied that any deployment or bite occurred, inflicted additional psychological distress upon Plaintiff. Knowing that the truth of his physical suffering was erased from the official record—and that those responsible would attempt to bury the facts—contributed to feelings of helplessness, humiliation, and betrayal. The institutional nature of the cover-up added to the severity of the emotional trauma.

52. That a second controversial K9 deployment occurred in January 2025 involving the same trooper—despite his submission of a falsified report in Plaintiff's case—further demonstrates that NHSP failed to correct or even scrutinize false official accounts. This inaction emboldened subsequent misconduct and demonstrates a culture of tolerance for falsified reports and unconstitutional conduct.

53. This false testimony, given under oath, further demonstrates the Defendants' intent to fabricate evidence, which led directly to Plaintiff being charged with resisting arrest.

54. The charge of resisting arrest was never formally prosecuted, indicating that even the prosecution found the Troopers' statements unreliable or false, consistent with the objective evidence.

55. These falsified reports and sworn false testimony violated Plaintiff's clearly established rights under the Fourteenth Amendment to be free from government fabrication of evidence that could result in legal process, false charges, or deprivation of liberty.

56. The fabrication further undermined Plaintiff's access to a fair and accurate investigation, obscured the severity of the excessive force used, and caused lasting reputational and psychological harm.


**Authorities:**

- *Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004)
- *Burke v. Town of Walpole*, 405 F.3d 66 (1st Cir. 2005)
- *Ricciuti v. NYC Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)
- *Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir. 1980)
- *Aponte Matos v. Toledo Davila*, 135 F.3d 182 (1st Cir. 1998)

# Count IV - Deliberate Indifference to Serious Medical Needs (42 U.S.C. § 1983 - Fourteenth Amendment)

57. At the time of the incident, Plaintiff had not been convicted of any crime. His rights were thus protected by the Due Process Clause of the Fourteenth Amendment.
58. Following the K9 attack, Plaintiff was visibly bleeding, in pain, and restrained in handcuffs.
59. Despite the obvious nature of his injuries, none of the Defendants provided medical assistance or took prompt steps to summon aid.
60. Plaintiff remained untreated for approximately fifteen (15) minutes until an ambulance arrived.
61. Emergency medical services in the region—including Bow and surrounding towns— typically respond within approximately four to five minutes, according to public data from local EMS agencies.
62. In Plaintiff's case, however, EMS records show that the call for an ambulance was placed approximately one to two minutes after the attack. Despite the timely call, Plaintiff experienced a prolonged wait before receiving care. This extended response time, combined with the lack of reassurance, comfort, or basic first aid from officers, left Plaintiff in distress and worsened his condition.
63. Trooper Myrdek's statement, "The ambulance is on the way," though factually accurate, was delivered without offering any physical assistance or emotional support. His follow-up comment—"I can't help you, I'm not an EMT"—further reflected a dismissive attitude toward Plaintiff's immediate suffering.

**Authorities:**

- *Estelle v. Gamble*, 429 U.S. 97 (1976)
- *Farmer v. Brennan*, 511 U.S. 825 (1994)
- *Feeney v. Corr. Med. Servs.*, 464 F.3d 158 (1st Cir. 2006)
- *DesRosiers v. Moran*, 949 F.2d 15 (1st Cir. 1991)
- *Sanchez v. Pereira-Castillo*, 590 F.3d 31 (1st Cir. 2009)

# Count V - Municipal Liability (Monell Claim) (42 U.S.C. § 1983)

64. The New Hampshire State Police maintained customs, policies, and practices that directly caused the constitutional violations described above.

65. NHSP's failure to discipline or investigate Trooper Myrdek following a prior K9 deployment on May 30, 2021—under similar roadside conditions—demonstrates a pattern of constitutional violations involving the use of police dogs against individuals who are not actively resisting or fleeing. Despite public press releases and online discussion of that incident, NHSP retained Myrdek and continued to authorize him to deploy a K9 without any documented reform or oversight. This repeated failure of supervision and discipline constitutes deliberate indifference and was a moving force behind the injuries Plaintiff sustained in June 2024. NHSP's inaction amounts to a custom or policy of tolerating excessive force in K9 deployments.

66. On or about January 23, 2025, another incident involving Trooper Derek Myrdek and a K9 deployment was publicly reported. Preliminary details indicate that the encounter, which occurred during a roadside stop under nonviolent circumstances, again resulted in a controversial use of force involving a police dog. This event occurred nearly a year after Plaintiff's mauling on February 17, 2024. Yet, NHSP permitted Trooper Myrdek to continue deploying his K9 unit without any apparent additional oversight or corrective intervention.

67. This subsequent incident underscores NHSP's ongoing failure to investigate, retrain, or discipline Trooper Myrdek, and serves as further evidence of a policy or custom of deliberate indifference. The Department's refusal to impose any safeguards—even in the face of a well-documented constitutional violation—allowed continued violations of citizens' rights. This pattern of misconduct establishes municipal liability under *Monell* and supports Plaintiff's claims for systemic failure.

68. Plaintiff has submitted formal public records requests under the New Hampshire Right-to-Know Law (RSA 91-A), seeking all K9 deployment records by the New Hampshire State Police from January 1, 2021, to the present. These requests are intended to identify additional instances where K9s were deployed under circumstances similar to those described herein, particularly involving Trooper Derek Myrdek. The requested information is reasonably expected to reveal a pattern of excessive force, a lack of supervisory oversight, or policy violations that have gone uncorrected. NHSP's failure to investigate or track problematic K9 use, if

confirmed, will further support Plaintiff's claims under *Monell v. Dep't of Soc. Servs.* and demonstrate deliberate indifference to known risks of unconstitutional force.

69. These included a failure to adequately train and supervise officers regarding the deployment of K9 units, the use of force against compliant subjects, and the use and preservation of body-worn camera footage.

70. NHSP's failure to implement appropriate accountability and oversight measures allowed a culture of tolerance for misconduct to persist.

71. The deliberate indifference of NHSP in its hiring, training, and supervisory practices was a moving force behind the injuries sustained by Plaintiff.

## Authorities:

- **Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)**
  Established that a municipality may be held liable under § 1983 when the execution of an official policy or custom inflicts constitutional injury. Plaintiff need not show an express policy—repeated inaction or tolerance of misconduct may suffice.

- **City of Canton v. Harris, 489 U.S. 378 (1989)**
  Held that a municipality can be liable for failure to train where the failure amounts to deliberate indifference to the rights of persons with whom the police come into contact.

- **Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989)**
  The First Circuit affirmed Monell liability where a police department had a widespread custom of constitutional violations and failed to take corrective action. One prior incident followed by similar future misconduct may be sufficient.

- **Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005)**
  Clarified that a plaintiff may demonstrate municipal liability by showing a pattern of violations or deliberate indifference to the risk of such violations recurring. The City's failure to act in the face of known misconduct supported Monell liability.

- **Haley v. City of Boston, 657 F.3d 39 (1st Cir. 2011)**
  The court held that failure to investigate or discipline officers after constitutional violations can be used to prove a policy of deliberate indifference under Monell.

# Count VI – Intentional Infliction of Emotional Distress (New Hampshire Common Law)

72. Defendants' conduct—including the unjustified K9 mauling, failure to render aid, audible laughter while Plaintiff was injured, and the submission of false reports— was extreme, outrageous, and beyond the bounds of civilized behavior.

73. After the attack, Plaintiff—bleeding, disoriented, and in visible distress—was ordered to walk, under his own power, to an ambulance dispatched by the Bow Fire Department. He was handcuffed to a stretcher despite the clear medical trauma to his midsection. The pain was so severe that Plaintiff could not discern which troopers were involved in this transfer.

74. While being treated at Concord Hospital, Plaintiff overheard a member of law enforcement in the hallway, outside his hospital room, make the sarcastic remark: "Did the K9 get a treat?" The tone and timing of the comment were unmistakably arrogant and malicious, further exacerbating Plaintiff's trauma. The comment was made while Plaintiff lay restrained and wounded just feet away.

75. Such conduct—compelling a grievously injured person to walk unaided to a stretcher, restraining him in that condition, and making mockery of the violent mauling that had just occurred—was intended to inflict emotional harm, or at a minimum, reflected a reckless disregard for the likelihood of causing such harm.

76. As a direct and foreseeable result, Plaintiff suffered—and continues to suffer— severe emotional distress, including but not limited to anxiety, humiliation, loss of dignity, nightmares, and post-traumatic stress disorder.

**Authorities:**

- *Rivard v. Dube*, 123 N.H. 1 (1982) (recognizing claim for intentional infliction of emotional distress where conduct is extreme and outrageous)
- *Morancy v. Morancy*, 134 N.H. 493 (1991) (extreme and outrageous conduct includes that which goes beyond all possible bounds of decency)
- *Mikell v. SAU No. 33*, 158 N.H. 723 (2009) (IIED claim permitted where actions were done with reckless disregard of causing emotional distress)
- *Konefal v. Hollis/Brookline Coop. Sch. Dist.*, 143 N.H. 256 (1998) (elements of IIED include outrageous conduct and severe emotional harm)

- *Restatement (Second) of Torts* § 46 (1965) (establishes the framework for liability for intentional or reckless infliction of emotional distress)

# Count VII – Unlawful Use of Police K9 (42 U.S.C. § 1983 – Fourth Amendment)

77. The use of a police K9 constitutes a significant application of force and is subject to the Fourth Amendment's requirement that all force be objectively reasonable under the circumstances. Federal courts, including the First Circuit, have recognized that the deployment of a K9 on a surrendered or non-resisting individual may constitute excessive force.

78. At the time of the K9 deployment, Plaintiff was unarmed, standing outside his vehicle with both hands visibly raised in the air. He was fully compliant and made no movements that could reasonably be interpreted as resistance, aggression, or flight.

79. Notwithstanding Plaintiff's compliance, Defendant Trooper Derek Myrdek released his K9 "Ragnar" without issuing a verbal warning or providing Plaintiff a meaningful opportunity to surrender further. The dog immediately bit Plaintiff in the abdomen—a non-extremity, vulnerable area—and dragged him to the ground, causing severe injuries.

80. The K9 continued to bite Plaintiff for an extended duration, including after he was prone on the ground and in the process of being handcuffed. Plaintiff repeatedly informed officers he was not resisting and begged for the dog to be removed. Trooper Myrdek refused, stating, "I have to secure you before I take the dog off," thereby deliberately prolonging the mauling.

81. Sergeant Mark Barrett arrived during the attack, assisted in handcuffing Plaintiff, and made no effort to call off the K9, despite witnessing Plaintiff's continued compliance and visible distress. His failure to intervene enabled the ongoing constitutional violation.

82. No exigent circumstances existed to justify the dog's deployment. Plaintiff posed no immediate threat to the safety of officers or the public, and the crime for which he was being detained was nonviolent. Moreover, there was no indication that he was attempting to flee, resist, or destroy evidence.

83. The deployment of a police K9 under these circumstances—without warning, against a compliant individual, and with prolonged biting even after Plaintiff was restrained—constitutes excessive force under clearly established law.

84. As a direct and proximate result of Defendants' conduct, Plaintiff suffered extensive physical injuries, permanent scarring, severe pain, emotional trauma, and economic damages.

85. Trooper Myrdek's official justification, citing Plaintiff's size and attire, confirms that the K9 deployment was not based on any imminent danger or resistance. Instead, it was a prejudicial response grounded in bias and retaliation, in violation of clearly established constitutional limits on the use of force.

86. In addition to the factual inconsistencies detailed above, Plaintiff obtained an official NHSP K-9 Incident Report relating to this event. The report, labeled as such and bearing the identifiers of K-9 Ragnar and handler Trooper Derek Myrdek, is dated contemporaneously with the incident and signed by Trooper Conor Davis as the author and Sergeant Mark Barrett as the reviewing supervisor.

87. Despite the clear evidence of a violent K-9 attack—including physical injury, contemporaneous bodycam audio, and post-incident photographs—the official report falsely indicates "No Deployment" and explicitly states "No Bite Apprehension." These representations are directly contradicted by the medical evidence and footage, both of which show Ragnar biting and dragging Plaintiff to the ground while he was visibly compliant and unarmed.

88. The report also fails to record any search type or justification for K-9 involvement. It states that the incident was "cleared by arrest" but omits all references to the use of force, visible injuries, or K-9 contact.

89. The submission of a materially false use-of-force report, particularly by Trooper Davis—who was not the handler but who nonetheless took it upon himself to document the incident—and its endorsement by Sgt. Barrett, constitutes powerful evidence of an orchestrated cover-up. This document directly supports Plaintiff's claims in Count III (Fabrication of Evidence), Count V (Municipal Liability), and Count VI (Intentional Infliction of Emotional Distress), by demonstrating both the falsification of official records and the failure of supervising officers to uphold their legal duties.

90. The NHSP's failure to investigate or correct the false reporting—despite physical injuries, video documentation, and an obvious K-9 deployment—further illustrates a pattern of deliberate indifference and systemic tolerance for unconstitutional conduct.

- **Graham v. Connor, 490 U.S. 386 (1989)**
  Established the "objective reasonableness" standard under the Fourth Amendment

for assessing use of force. Even split-second decisions must be justified by the totality of the circumstances.

- **Jennings v. Jones, 499 F.3d 2 (1st Cir. 2007)**
  The First Circuit held that continued use of force against a subdued and compliant suspect can constitute excessive force, even if initial force was justified.
- **Campbell v. City of Springboro, 700 F.3d 779 (6th Cir. 2012)**
  Denying summary judgment where K9 continued to bite plaintiff after he had surrendered, as it was clearly established that such force was unlawful.
- **Becker v. Elfreich, 821 F.3d 920 (7th Cir. 2016)**
  Deployment of a police K9 against a compliant suspect without warning was held unconstitutional; use of a dog is a significant level of force.
- **Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007)**
  Even if initial force is permissible, continued force after suspect ceases resistance violates the Fourth Amendment. This includes dog bites while handcuffed or prone.

## Count VIII – Retaliation for Protected Conduct (42 U.S.C. § 1983 – First and Fourteenth Amendments)

91. On or about May 28, 2025, Plaintiff served a formal Notice of Intent to Sue upon the New Hampshire State Police and relevant state actors, alleging civil rights violations arising from the events of February 17, 2024. On or about June 7, 2025, Plaintiff delivered a follow-up Letter of Demand, placing Defendants on additional notice of imminent federal litigation.

92. Shortly thereafter, the Merrimack County Attorney's Office filed an objection to Plaintiff's pending motion to suspend the remainder of his sentence under RSA 651:20. The objection was made despite Plaintiff's exceptional institutional record, completion of six rehabilitative programs, clean disciplinary history, and ongoing success on home confinement.

93. Since his release, Plaintiff has voluntarily completed the 20-hour Impaired driver program and has engaged in weekly therapy with a licensed mental health professional. Plaintiff's consistent efforts reflect his rehabilitation and reintegration into the community.

94. Plaintiff reasonably believes that the State's objection was made in retaliation for his exercise of constitutionally protected rights—namely, the First Amendment right to petition the government for redress of grievances. The temporal proximity

between Plaintiff's protected legal activity and the State's adverse action supports a plausible inference of retaliatory motive.

95. Defendants' retaliatory conduct was designed to punish Plaintiff for asserting his rights, to chill his access to the courts, and to undermine his pursuit of justice through federal civil rights litigation. Such conduct is prohibited under clearly established law.

96. Plaintiff engaged in constitutionally protected activity when he submitted a Notice of Intent to Sue on or about May 28, 2025, and a formal Letter of Demand on or about June 7, 2025, regarding civil rights violations by the New Hampshire State Police and affiliated state actors.

97. Shortly after receiving these communications, the Merrimack County Attorney's Office filed an objection to Plaintiff's pending motion to suspend his sentence under RSA 651:20, despite Plaintiff's exemplary institutional conduct, rehabilitation efforts, and current successful home confinement.

98. The proximity in time between Plaintiff's protected activity and the State's objection, along with Plaintiff's otherwise strong record, supports a plausible inference that the objection was retaliatory in nature.

99. The State's objection was designed to punish Plaintiff for seeking legal redress and to deter him from exercising his rights under the Constitution. Such retaliatory conduct violates the First Amendment's protection of petitioning the government for redress of grievances, as incorporated through the Fourteenth Amendment.

100. As a direct and proximate result of this retaliatory conduct, Plaintiff has suffered emotional distress, reputational harm, and ongoing hardship related to the continuation of his sentence.

101. Notably, the Merrimack County Attorney's Office did not object to Plaintiff's placement on At-Home Confinement ("AHC"), which was granted without opposition following Plaintiff's demonstrated rehabilitation and good conduct. However, only after Plaintiff submitted a formal Notice of Intent to Sue on May 28, 2025, and followed it with a Letter of Demand on June 7, 2025, did the State abruptly reverse course and file an objection to Plaintiff's motion to suspend the remainder of his sentence under RSA 651:20. The sudden shift—despite no intervening misconduct, Plaintiff's continued compliance with AHC, successful completion of rehabilitative programs, and ongoing therapy—strongly supports a plausible inference of retaliatory intent. The proximity in time, combined with the inconsistency in the State's position and Plaintiff's otherwise unblemished post-release record, suggests the objection was not motivated by legitimate safety concerns or new facts, but rather in retaliation for Plaintiff's protected activity under the First Amendment.

**Authorities:**

- *Nieves v. Bartlett,* 139 S. Ct. 1715 (2019) – Retaliatory state action for constitutionally protected conduct violates the First Amendment when not supported by probable cause or neutral justification.
- *Hartman v. Moore,* 547 U.S. 250 (2006) – Government officials may not take adverse action in retaliation for speech protected by the First Amendment.
- *Thaddeus-X v. Blatter,* 175 F.3d 378 (6th Cir. 1999) – Retaliation for engaging in protected conduct is actionable under § 1983 when it would deter a person of ordinary firmness from continuing to engage in that conduct.
- *Toolasprashad v. Bureau of Prisons,* 286 F.3d 576 (D.C. Cir. 2002) – Filing grievances or litigation is protected activity under the First Amendment.
- *Antoine v. Ramsey,* 2016 U.S. Dist. LEXIS 166357 (D.N.H. 2016) – Denial of parole or sentence suspension may support a First Amendment retaliation claim when linked to protected litigation conduct.
- *Hartman v. Moore,* 547 U.S. 250 (2006) – Establishes that retaliatory actions taken in response to protected First Amendment activity are unconstitutional.
- *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977) – Recognizes that retaliation for the exercise of constitutional rights is actionable under § 1983.
- *Carey v. Savage,* 2022 WL 3544258 (D.N.H. Aug. 18, 2022) – Denial of privileges or benefits in retaliation for litigation or complaints can form basis for First Amendment claim.
- *Perez v. Fenoglio,* 792 F.3d 768 (7th Cir. 2015) – Official conduct that deters access to courts may violate First Amendment rights.
- *Starr v. Dube,* 334 F. App'x 341 (1st Cir. 2009) – Retaliatory motive may be inferred from timing and lack of alternative justification.

# Count IX – Motion for Spoliation Sanctions (Against All Defendant Troopers)

102.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

103.    Defendants had a duty to preserve all evidence related to the February 17, 2024, incident, including full and unaltered body-worn camera footage.

104.    At a critical point during the aftermath of the K9 attack, video footage from a New Hampshire State Police body camera shows an officer smiling and laughing while Plaintiff remained visibly injured.

105.    During this exact period, the audio recording on the Trooper's body camera was intentionally muted, in violation of departmental policy requiring continuous audio recording.

106.    The muting of body-worn camera footage following a violent use-of-force incident constitutes suppression of relevant evidence and is strongly indicative of bad faith.

107.    Plaintiff asserts that this muting was done deliberately to conceal damaging or unprofessional statements made by the involved officers during a critical post-incident period.

108.    As a direct result of Defendants' actions, Plaintiff has been prejudiced in his ability to fully present his case and to reconstruct key details of the officers' conduct and intentions.

109.    Plaintiff respectfully moves the Court to exercise its inherent authority to impose appropriate sanctions for spoliation of evidence, including but not limited to: a. An adverse inference instruction to the jury that the muted conversations would have been unfavorable to Defendants; b. Preclusion of certain defenses or testimony related to those muted interactions; c. Monetary or evidentiary sanctions deemed just and proper under the circumstances.

110.    On or about May 28, 2025, Plaintiff submitted a formal RSA 91-A Right-to-Know request to the New Hampshire State Police, seeking public records related to K9 deployments, body-worn camera footage, and incident reports directly relevant to the February 17, 2024, use of force.

111.    The State Police responded by stating that they required **75 days** to produce the records—well beyond the five-business-day limit set by RSA 91-A:4. Plaintiff objected to this excessive delay and demanded rolling disclosure or a reasonable alternative. The State failed to respond further.

112.    On June 18, 2025, Plaintiff filed a verified petition in Merrimack County Superior Court to compel disclosure under RSA 91-A:7. The Court has since scheduled a formal hearing on the petition for **July 31, 2025,** confirming that the matter raises credible allegations of noncompliance with state transparency law.

113.    The State Police's failure to comply with its statutory obligations under RSA 91-A reflects a pattern of withholding evidence and obstructing public access to records that are directly material to Plaintiff's claims. This conduct supports a finding of spoliation of evidence and further justifies an adverse inference against Defendants.

**Authorities:**

- *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)
- *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991)
- *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)
- *Booker v. Mass. Dep't of Pub. Health*, 612 F.3d 34, 46 (1st Cir. 2010)
- *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217–18 (1st Cir. 1982)

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

a. Award **compensatory damages** in an amount to be determined at trial;

b. Award **punitive damages** against the individual Defendants;

c. Award **costs of suit and reasonable attorney's fees** under 42 U.S.C. § 1988;

d. Issue **declaratory relief** that Defendants' conduct violated Plaintiff's constitutional rights, and **injunctive relief** directing NHSP to implement policy reforms regarding K9 deployment oversight, public disclosure of use-of-force data under RSA 91-A, and mandatory body camera compliance;

e. Award **pre- and post-judgment interest** as allowed by law.

f. Grant such **other and further relief** as the Court deems just and proper.


Respectfully submitted,

/s/ Richard M. Greeley

 **Richard M. Greeley,**

**Pro Se Plaintiff**

2 McElroy Street Goffstown, NH 03045

 richgreeley93@gmail.com

(603) 268-1742

Dated: July 6, 2025


# Visual Evidence Summary (Exhibits A–F)

To support Plaintiff's factual allegations and underscore the plausibility of his claims under Rule 8(a) of the Federal Rules of Civil Procedure, Plaintiff provides the following photographic evidence, attached as Exhibits A through F. These images depict the sequence of events surrounding the unconstitutional use of a police K9 against a surrendering individual, the resulting physical injuries, and an official police report falsely denying deployment.

## Exhibit Descriptions (A–F)

- **Exhibit A** – Still image taken at 00:25:26 EST showing Plaintiff at a distance with arms raised, standing in the snow, visibly surrendering. No aggressive or evasive behavior is evident.
- **Exhibit B** – Close-up image at 00:25:32 EST showing Plaintiff on the ground with the K9 on top of him. Plaintiff had just been taken down and was actively being mauled, with arms still raised, clearly surrendering.

- **Exhibit C** – Frame at 00:25:58 EST showing Plaintiff on the ground in visible distress, face-down in the snow hands behind back and cuffed. This is moments after the K9 takedown, before any medical aid was rendered. Blood is beginning to accumulate.
- **Exhibit D** – Still frame at 00:26:20 EST showing Sergeant Mark Barrett approaching and beginning to apply his knee to Plaintiff's back while Plaintiff is prone. Plaintiff had just been brutally ripped to the ground by the K9 and was actively being mauled at the moment this image was captured. Despite the ongoing attack, no attempt was made to call off the K9 or render aid, and Plaintiff's arms were still visible, showing no resistance.
- **Exhibit E** – Injury photograph taken approximately 11 days later while Plaintiff was in jail custody, showing extensive K9 bite wounds, deep bruising, and multiple lacerations to Plaintiff's torso. These injuries confirm the duration and severity of force used.
- **Exhibit F**– Contradictory Police Report

  Official New Hampshire State Police report stating, "No K9 deployment," and clearing the scene "by arrest." This directly contradicts both the body camera footage and the physical injuries documented in Exhibits A–F, and supports Plaintiff's claims of fabrication, falsification of official records, and spoliation of evidence.