UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Richard Greeley

v. Civil No. 25-cv-261-SE-AJ
Opinion No. 2026 DNH 132

New Hampshire State Police, et al.

ORDER

On an early morning in February 2024, a New Hampshire State Trooper attempted to execute a traffic stop on a car that had failed to come to a complete stop at a stop sign. The driver of the car, Richard Greeley, did not pull over and instead led the trooper on a lengthy, high-speed chase. Eventually, Greeley turned onto a dead-end street, put his car in reverse, and got out to flee on foot, while his empty vehicle backed into the Trooper's. The trooper deployed his K-9 partner and, with the help of backup, apprehended and arrested Greeley. Greeley later pleaded guilty to two felonies stemming from the arrest: reckless conduct with a deadly weapon and drug possession. State v. Richard M. Greeley, Case No. 217-2024-CR-00140 (filed Feb. 28, 2024 Merrimack. Super. Ct.). He also pleaded guilty to DUI aggravated attempt to elude police. Id. Eight other charges were nolle prossed. Id.

From these undisputed facts, all recorded on video, Greeley brought this suit against the New Hampshire State Police and the officers involved in his apprehension and arrest. Greeley, proceeding pro se, brought a litany of claims, including intentional infliction of emotional distress. After preliminary review, two of those claims remain: an excessive force claim and a claim of evidence fabrication.

The remaining three defendants move for summary judgment on both claims, arguing that the undisputed record evidence shows that they did not violate Greeley's rights and, in any

event, they are entitled to qualified immunity. Doc. no. 16. Greeley objects, essentially arguing that a jury could interpret the video evidence in a manner favorable to him and inconsistent with the officers' sworn statements. For the reasons that follow, the court grants the defendants' motion for summary judgment.

## Standard of Review

Granting summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "carries with it the potential to affect the outcome of the suit." French v. Merrill, 15 F.4th 116, 123 (1st Cir. 2021) (quotation omitted). A material fact is in genuine dispute if "a reasonable jury could resolve the point in the favor of the non-moving party." Id. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018). The court may consider materials cited in the motion and other materials in the record. Fed. R. Civ. P. 56(c)(1)(3). In light of the Greeley's pro se status, the court liberally construes his pleadings. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam).

## Summary Judgment Record

The Federal Rules of Civil Procedure and this court's local rules require parties filing motions for summary judgment and those opposing them to include statements of material fact citing to evidence in the record. Fed. R. Civ. P. 56(c); LR 56.1(b). A party opposing a motion for summary judgment who will bear the ultimate burden of proof on a given issue at trial "must present definite, competent evidence sufficient to establish the elements of [his] claim in order to

survive a motion for summary judgment." Pina v. Children's Place, 740 F.3d 785, 796 (1st Cir. 2014) (citation and punctuation omitted). "[U]nsworn allegations contained in a complaint, without more, are not enough to oppose a properly supported motion for summary judgment." Goguen v. Allen, 780 F.3d 437, 457 (1st Cir. 2015). And "[f]acts set forth in a legal memorandum are not sufficient to raise an issue for trial when they are not supported by evidence in the record." Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 402 (1st Cir. 1988). If the party moving for summary judgment properly supports material facts in its factual statement, they may be deemed admitted for the purposes of the motion unless the party opposing the motion properly opposes those facts. LR 56.1(b); see also Fed. R. Civ. P. 56(e)(2); CMI Cap. Mkt. Inv., LLC v. Gonzalez–Toro, 520 F.3d 58, 62–63 (1st Cir. 2008).

"While pro se complaints and filings are construed liberally, Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 75–76 (1st Cir. 2014), even pro se litigants are bound by the Federal Rules of Civil Procedure." Wheeler v. United Parcel Serv. Inc., No. 25-CV-372-JL-AJ, 2026 WL 1082635, at *2 (D.N.H. Mar. 24, 2026), report and recommendation approved, No. 25-CV-372-JL-AJ, 2026 WL 1081086 (D.N.H. Apr. 21, 2026). Thus, even a pro se party must properly support facts when opposing summary judgment. In deference to his pro se status, however, a court may consider a pro se party's sworn assertions in the record, such as deposition testimony or factual assertions in verified pleadings and affidavits, even if the pro se party does not correctly cite to those statements in his opposition. See Goguen v. Allen, 780 F.3d 437, 457 (1st Cir. 2015).

In this case, the record includes dashcam and bodycam video footage (doc. nos. 16-3 & 16-4), police reports (doc. nos. 1-3 at 6 & 16-5), and sworn affidavits from the defendant officers (doc. nos. 16-2, 16-6, 16-7, & 16-8). Greeley's objection to the defendants' summary judgment

motion offers portions of the officers' depositions (doc. no. 24 at 17-25) and certain other record materials that, likewise, have marginal, if any, relevance to his claims, as explained further below. But he does not offer an affidavit or declaration sworn under the penalty of perjury that contests the defendants' accounts of the relevant events, and his complaint is not verified under the penalty of perjury. Instead, he relies primarily on the video evidence, which he argues is ambiguous. Hence, to the extent that the officers' sworn statements are not inconsistent with the video evidence and address any ambiguity, they are deemed admitted for summary judgment purposes.

As is required, the facts below are based on the competent evidence in the record, viewed in the light most favorable to Greeley.

## Background

At about midnight on the morning of February 17, 2024, New Hampshire State Trooper Derek Myrdek was on patrol near the Best Western Hotel in Concord, New Hampshire. Trooper Myrdek was in a marked vehicle with his K-9 partner, Ragnar, for whom he has been a handler since February 2018. Trooper Myrdek knew that the area around the Best Western is a popular area for selling and distributing drugs.

Around 12:15 a.m., Trooper Myrdek saw a black Mercedes sedan leave the Best Western parking lot. He followed the car in his police vehicle as it merged onto I-93 South, and then onto I-89 North, and took Exit 1. That exit ends with a stop sign. The car made a right turn but did not come to a complete stop. Trooper Myrdek activated his blue emergency lights to initiate a traffic stop.

Greeley was driving the car. He did not pull over. Instead, after about ten seconds, the car increased its speed dramatically, reaching approximately 60 miles per hour in an area in which the speed limit was 30 miles per hour. Trooper Myrdek activated his audible siren.

For the next approximately eight minutes, Greeley led Trooper Myrdek on a dangerous, high-speed chase on residential roads. During the pursuit, Greeley repeatedly drove at high rates of speed and on the wrong side of two-lane roads, swerved in and out of lanes, made a U-turn around a median, and haphazardly applied his brakes before accelerating beyond the speed limit again. Trooper Myrdek continued to follow the car in his police vehicle and requested backup. Based on his experience, Trooper Myrdek believed that the driver of the car was under the influence of alcohol or drugs.

Eventually, Greeley made a left turn onto a short, dead-end street. The street was surrounded by woods and covered with snow. Trooper Myrdek pulled his vehicle directly behind Greeley's. Greeley shifted his car into reverse and exited the car to flee on foot while it was still moving. Trooper Myrdek jumped out of his vehicle and shouted, "State Police K-9, stop or you'll get bit." Trooper Myrdek recognized that Greeley was bigger than him. He could not tell whether there were any passengers in the car. Because of Greeley's position, Trooper Myrdek could not see Greeley's right hand. Trooper Myrdek's backup had not arrived. Greeley took a few quick steps away from his car as it backed into Trooper Myrdek's vehicle.

Trooper Myrdek then broke eye contact with Greeley while he turned and opened the passenger door behind him to release Ragnar. By the time Trooper Myrdek looked back at Greeley after releasing Ragnar, Greeley had stopped moving and put his hands up. Ragnar jumped at Greeley and bit him on his lower right torso. About 12 seconds elapsed between the time Greeley turned onto the dead-end street and Ragnar bit Greeley.

Greeley fell to the ground as Ragnar bit him. Trooper Myrdek approached Greeley and, as Greeley's right hand had moved down towards Ragner, repeatedly yelled at Greeley, "don't reach for him" and ordered him to put his hands out. Greeley complied. Trooper Myrdek told Greeley to "let me cuff you up and I'll take him off," referring to Ragnar. Over the next approximately 40 seconds, Trooper Myrdek worked to handcuff Greeley. He repeatedly told Greeley to roll over from his back to his front and to place his hands behind his back. It was difficult to handcuff Greeley because of his movement and his size. Ragnar remained latched onto Greeley, and Greeley shouted at various times, "you got me," "I'm sorry," and "it hurts." Trooper Myrdek repeatedly advised Greeley that he would remove Ragnar as soon as he secured the handcuffs.

About 50 seconds after Ragnar first bit Greeley, Sergeant Mark Barrett arrived. Trooper Myrdek asked Sergeant Barrett to finish securing the handcuffs. Ultimately, the officers were required to use two pairs of handcuffs due to Greeley's size. Greeley asked Trooper Myrdek to get the dog off him, and Trooper Myrdek responded, "yup, I'm getting him off now." Trooper Myrdek removed Ragnar, walked him back to the police vehicle, and secured him as soon as Sergeant Barrett handcuffed Greeley. Ragnar was engaged with Greeley for approximately 13 seconds once Sergeant Barrett arrived and about one minute in total. Neither Trooper Myrdek nor Sergeant Barrett kneeled on any part of Greeley's body during the arrest.

As additional officers arrived and began processing the scene, Trooper Myrdek observed that Greeley showed several signs of being intoxicated. Those signs included Greeley exuding a strong odor of alcohol from his mouth and repeatedly asking the same questions, as well as his slurred speech, red and bloodshot eyes, and flushed face.

Trooper Conor Davis was another one of the officers who arrived at the scene in response to Trooper Myrdek's call for backup. Trooper Davis is also a certified K-9 handler, and arrived with his K-9 partner, Mando. He assisted with the inventory search of Greeley's vehicle, during which he located a large quantity of marijuana products in the trunk, and a ball-peen hammer in the driver's side door. He did not deploy Mando.

Greeley was taken into police custody and later transported to Concord Hospital for treatment of the injuries caused by Ragnar's bite. After being discharged from the hospital, Greeley was transported to the Merrimack County Correctional Facility.

The following day, February 18, 2024, Trooper Myrdek submitted a probable cause affidavit to the Merrimack County Circuit Court. Doc. no. 16-6. He stated in the affidavit: "The driver of the Mercedes left the car in reverse, immediately opened the door, exited, and began to run. I got out of the cruiser, shouted 'State Police K-9, stop or you'll get bit.' The driver did not stop and was apprehended by my K-9 'Ragnar.'" Id., ¶ 9. Trooper Myrdek subsequently testified consistent with that affidavit at Greeley's probable cause hearing on or around February 27, 2024.

Greeley was charged with several crimes, including multiple drug felonies, reckless conduct with a vehicle, disobeying an officer, driving under the influence, and resisting arrest.

Both Trooper Davis and Trooper Myrdek later completed K-9 Incident Reports. Trooper Davis completed his report on March 3, 2024. Doc. no. 1-3 at 6. Sergeant Barrett reviewed and signed the report. The report explained Trooper Davis's involvement with the arrest, including how he "responded to the pursuit in case myself or my K-9 team was needed to assist at any point." Id. The report also detailed the scene when and after Trooper Davis arrived and described the drugs found during the inventory of Greeley's vehicle. Near the top of the report, there are

various headings under which an officer can provide certain specifics about the incident. For example, there are headings for "Handler Name" and "Canine Name." Trooper Davis wrote Trooper Myrdek's name and Ragnar's name respectively under those headings. Id. Under the headings "K-9 Incident Type" and "K-9 Incident Disposition," Trooper Davis wrote "No Deployment." Id.

Trooper Myrdek completed his K-9 Incident Report on March 14, 2024. Doc. no. 16-5. The report stated, in relevant part:

> The Mercedes came to abrupt stop, with the car still in reverse, and I observed the driver's door start to open.
>
> I began to exit my cruiser shouting "State Police K-9, stop or you'll get bit!". Over the course of my career, I have been involved in numerous motor vehicle pursuits. Someone who intends to give up at the end of a pursuit remains inside their vehicle until ordered out. I observed a large male, who was significantly larger than myself, abruptly run out of the Mercedes as the Mercedes struck my cruiser. I observed the large male quickly looked to his left as he ran out of the Mercedes, and then looked towards me. It appeared to me as if the male was looking for a place to flee towards when I observed the large male advance in my direction.

Id. at 5. The report further stated that Trooper Myrdek "deployed my K-9 'Ragnar' as a less lethal means to create space and to take the suspect into custody who I believed was about to flee or fight me." Id. At the top of the form, Trooper Myrdek listed himself under "Handler Name" and listed Ragnar under "Canine Name." Id at 1. He wrote "HIGH RISK MV STOP" under the heading "K-9 Incident Type" and "FIND" under the heading "K-9 Incident Disposition." Id.

Greeley pleaded guilty to two felonies stemming from the subject arrest—reckless conduct with a deadly weapon and a drug possession charge. He also pleaded guilty to a charge of DUI aggravated attempt to elude police. Prosecutors nolle prossed eight other charges, including disobeying an officer and resisting arrest. State v. Richard M. Greeley, Case No. 217-2024-CR-00140 (filed Feb. 28, 2024 Merrimack. Super. Ct.); see Isijola v. Grasso, 768 F. Supp.

3d 166, 171 (D. Mass. 2025) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." (cleaned up)).

## Discussion

The defendants move for summary judgment on the two claims remaining in this case: an excessive force claim against Trooper Myrdek and Sergeant Barrett (Count I) and an evidence fabrication claim against Troopers Myrdek and Davis and Sergeant Barrett (Count III). Doc. no. 16. Greeley initially responded by submitting a declaration pursuant to Rule 56(d) describing additional discovery that he needed in order to provide a substantive response to the motion. Doc. no. 18. The court allowed Greeley to depose the three defendants on matters "relevant to the claims remaining in this case" and file a supplemental objection to the summary judgment motion after he completed the depositions. March 4, 2026 End. Or. Greeley did so (doc. no. 24) after which the defendants filed a reply (doc. no. 25).

### I. Excessive Force

Greeley alleges in Count I that Trooper "Myrdek deployed the police dog against him without justification and failed to recall the dog even though Mr. Greeley was compliant and subdued." Doc. no. 5 at 7. The court also construed Count I to allege an excessive force claim against Sergeant Barrett, "who allegedly pressed his knee into Mr. Greeley's back while the police dog was still biting him." Id. at 8.

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010). "The

Fourth Amendment is implicated where an officer exceeds the bounds of reasonable force in effecting an arrest or investigatory stop." Id. (citing Graham v. Connor, 490 U.S. 386, 394–95 (1989)). To determine whether an officer used unreasonable force, the court first ascertains the relevant facts and circumstances. See, e.g., Velez v. Eutzy, 152 F.4th 292, 301 (1st Cir. 2025) (citation omitted). Here, due to the video evidence and the officers' affidavits, which the court has for all relevant purposes deemed admitted, the record contains no disputed material facts and there is no need to have a trial. See id. With the facts and circumstances established, the court next determines whether the force used was "objectively reasonable" under "the totality of the circumstances," which is a "question of law." Velez, 152 F.4th at 301 (citations omitted). The court analyzes "excessive force claims according to the constitutional touchstone of objective reasonableness, so [it does] not consider an officer's subjective intent or motivation." Raiche, 623 F.3d at 36 (quotations omitted). Additionally, the court views the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Graham, 490 U.S. at 396.

The "determination requires [the court] to balance the individual's interest against the government's, weighing three non-exclusive factors: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Raiche, 623 F.3d at 36 (quoting Graham, 490 U.S. at 396). Further, the court must be mindful that that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

The defendants make two arguments in favor of summary judgment. First, they argue that the undisputed evidence in the record demonstrates that Trooper Myrdek's and Sergeant Barrett's use of force in effectuating Greeley's arrest was objectively reasonable. Second, even if the court could not make that determination at this stage, they are entitled to qualified immunity.

Before analyzing the reasonableness of Trooper Myrdek's act of deploying Ragnar and the length of time he took to recall the dog, the court briefly addresses Greeley's excessive force claim in Count I against Sergeant Barrett. Greeley alleges that Sergeant Barrett used excessive force because he "pressed his knee into Mr. Greeley's back while the police dog was still biting him." Doc. no. 5 at 8.

Both Trooper Myrdek and Sergeant Barrett provided sworn testimony that Sergeant Barrett did not kneel on any part of Greeley during their interaction. Trooper Myrdek's bodycam footage is consistent with their sworn testimony. It shows the entirety of Sergeant Barrett's interaction with Greeley while Ragnar was engaged. It shows that Sergeant Barrett did not kneel on any part of Greeley at any point during that approximately 13-second timeframe. Greeley does not address this portion of his excessive force claim in his objection to the defendants' motion. Therefore, because the undisputed record evidence shows that Sergeant Barrett did not use excessive force during Greeley's arrest, the defendants are entitled to summary judgment as to that portion of Greeley's claim in Count I.

## A. Reasonableness of Trooper Myrdek's Deployment of Ragnar

Turning to the excessive force claim as alleged against Trooper Myrdek, viewing the record evidence in the light most favorable to Greeley, Trooper Myrdek's act of deploying Ragnar during Greeley's arrest was a reasonable use of force. Looking first at the severity of the

crime at issue, the "crime" is not the minor traffic infraction that initially led Trooper Myrdek to activate his police lights. Rather, it is the constellation of Greeley's criminal conduct, including the lengthy and dangerous car chase that led Trooper Myrdek to believe that Greeley was driving under the influence of alcohol or drugs. Again, Greeley ultimately pleaded guilty to felony reckless conduct with a deadly weapon as a result of the chase. There can be little question that "refus[ing] to stop when ordered to do so by [a police officer] and instead resist[ing] arrest by fleeing in [a] vehicle" when an officer believes that the defendant is driving under the influence of alcohol or drugs are crimes "sufficiently severe to allow [an officer] to use force if needed to arrest [the defendant] to protect himself and others." Tilson v. City of Elkhart, Ind., 96 F. App'x 413, 417-18 (7th Cir. 2004) (affirming grant of the defendants' summary judgment motion on excessive force claim based on the defendant officer's deployment of his K-9 partner during arrest); see also Salazar v. Molina, 37 F.4th 278, 281-82 (5th Cir. 2022) (the defendant's crime was severe for the purposes of an excessive force claim when he "led police on a dangerous car chase through a residential area and was charged with the felony of evading arrest with a vehicle"). Greeley does not dispute that the first factor weighs in favor of the reasonableness of Trooper Myrdek's decision to deploy Ragnar.

The second and third factors, immediate threat and active resistance or flight, also weigh in Trooper Myrdek's favor. Trooper Myrdek was faced with the following circumstances at the moment he decided to deploy Ragnar. Greeley had attempted to avoid a police stop by driving dangerously and erratically while placing Trooper Myrdek and other drivers at risk for approximately eight minutes. When he was finally cornered on a dead-end street with Trooper Myrdek's police vehicle right behind him, Greeley did not wait for Trooper Myrdek's commands. Rather, he immediately put his car in reverse, got out of the car while it was moving,

and took a few quick steps away from the car. Under these facts, where the defendant had spent several "minutes 'attempting to evade arrest by flight' in a highly dangerous manner . . . . [a]nd after stopping his car, [he] quickly exited it without a command and looked toward an open area—rather than staying in his vehicle and awaiting a command," both the second and third Graham factors are met. Salazar, 37 F.4th at 284 (quoting Graham, 490 U.S. at 396) ("If anything, these facts made it just as reasonable for Molina to fear that Salazar still sought to escape as it was for Molina to fear that Salazar was a threat to his or others' safety.).

Greeley counters that the video evidence is equivocal. He asserts that a reasonable jury could conclude from the video that he "was attempting to surrender, or had ceased active flight, when the bite occurred." Doc. no. 24 at 6. [1] He further points to what he claims are inconsistencies in the record that support the existence of a genuine dispute of material fact on this point. Specifically, he argues:

> The record contains a direct and material factual dispute regarding Plaintiff's conduct at the moment Ragnar made contact. Myrdek's probable cause affidavit states that Plaintiff "began to run" and "did not stop." But Myrdek's later affidavit states that when he reestablished visual contact, Plaintiff was "standing few steps away from his vehicle with both hands up," and the K-9 report likewise states that approximately 1.5 seconds after release, Myrdek observed Plaintiff with both hands up as Ragnar apprehended him. A reasonable jury could conclude from these conflicting accounts that Plaintiff was no longer continuing flight at the moment force was applied, but was instead attempting to surrender.

Doc. no. 24 at 8.

These minor inconsistencies are not material. None of the versions would support a finding that Greeley had stopped and surrendered before Trooper Myrdek released Ragnar. Further, Trooper Myrdek provided, in all relevant ways, the same exact story in his probable

[1] Interestingly, Greeley does not claim in his objection that he had surrendered or ceased active flight when Trooper Myrdek released Ragner, or even when the bite occurred. He only argues that the video evidence would permit a reasonable jury to conclude that he had.

cause affidavit, his K-9 incident report, and the affidavit he submitted in this case. That is, Greeley got out of his car while it was still moving without waiting for any command and took steps away from his vehicle in an apparent effort to flee. Trooper Myrdek warned Greeley that he would release his K-9 if he did not stop and, when Greeley had not yet stopped, Trooper Myrdek released Ragnar. By the time Trooper Myrdek looked back at Greeley after releasing Ragnar, Greeley had stopped running and put his hands up. Trooper Myrdek clarifies in his affidavit that "[u]ntil Greeley saw me moving to release Ragnar and then saw Ragnar approaching him, he gave no indication of surrender." Doc. no. 16-2, ¶ 13. Although the relevant portion of the video footage captured by Trooper Myrdek's dashcam did not have sound, it is not inconsistent with Trooper Myrdek's description of the event.

Because Greeley did not offer an affidavit or declaration sworn under the penalty of perjury that contests Trooper Myrdek's description of the relevant events, and his complaint is not verified under the penalty of perjury, the court accepts as true Trooper Myrdek's sworn statements. Thus, there is no genuine dispute on this record as to whether Greeley stopped moving and surrendered before Trooper Myrdek released Ragnar.

For those reasons, Trooper Myrdek is entitled to summary judgment as to Greeley's excessive force claim based on Trooper Myrdek's decision to deploy Ragnar.

B. <u>Reasonableness of the Time Trooper Myrdek Took to Recall Ragnar</u>

As mentioned, Trooper Myrdek deployed Ragnar and recalled him after Sergeant Barrett arrived and secured Greeley in handcuffs. Approximately one minute passed from the time Ragnar first bit Greeley to when Trooper Myrdek recalled Ragnar.

"[F]orce must be proportional to the threat posed, 'and as the threat changes, so too should the degree of force.'" Adle v. Maine Police Dep't, 279 F. Supp. 3d 337, 351–52 (D. Me. 2017) (quoting Cyrus v. Town of Mukwonago, 624 F.3d 856, 863 (7th Cir. 2010)); Lachance v. Town of Charlton, 990 F.3d 14, 23 n.8 (1st Cir. 2021). Therefore, the calculus that the court considers in evaluating whether the time Trooper Myrdek took to recall Ragnar was objectively reasonable differs from the court's consideration of Trooper Myrdek's decision to deploy Ragnar in the first instance.

Although the first Graham factor, the severity of the crimes at issue, is the same for the purposes of analyzing Trooper Myrdek's decision to release Ragnar and the length of time it took him to recall the dog, the court must reconsider the remaining factors. The determination of whether Greeley posed an "immediate threat" to Trooper Myrdek or others, and whether he was actively resisting arrest or attempting to evade arrest by flight, is not necessarily identical at those two points in time. Nevertheless, both factors still weigh in Trooper Myrdek's favor.

It is true that Greeley stopped moving and put his hands up after Trooper Myrdek released Ragnar. It is also true that Greeley fell to the ground after Ragnar bit him. But it is equally true that a reasonable officer at the scene would have viewed Greeley as a threat to the officer and the public until he was in handcuffs. Greeley had spent the last eight minutes demonstrating his willingness to put others in danger in order to escape. He had indicated his further willingness to try to flee by getting out of a moving car while it reversed into Trooper Myrdek's and taking steps to escape into the woods instead of waiting for Trooper Myrdek's commands. Trooper Myrdek was alone with Greeley, who was larger than him and suspected to be intoxicated. They were in a dark, residential neighborhood. In these circumstances, a reasonable officer would have believed that Greeley remained an immediate threat who would

injure the officer or the public or would evade arrest by flight if he were not restrained by either handcuffs or Ragnar. See Escobar v. Montee, 895 F.3d 387, 396 (5th Cir. 2018) ("Finally, the third Graham factor—whether the suspect was resisting or attempting to flee—largely folds into the second. If Escobar may have posed a threat, then he also might have attempted to flee once released by the dog.").

Greeley argues that when viewed in the light most favorable to him, "the video permits a reasonable jury to find that Plaintiff was cooperating with handcuffing rather than actively resisting." Doc. no. 24, ¶ 9. But that is not the relevant inquiry under Graham or on this record. Instead, the court must consider whether, in light of the totality of the circumstances based on the record evidence, a reasonable officer at the scene would have viewed Greeley as a threat and a risk of flight until he was secured in handcuffs. For the reasons discussed above, and viewing the evidence in the light most favorable to Greeley, the answer to that question is yes.[2]

In sum, the undisputed record evidence shows that the time Trooper Myrdek took to recall Ragnar falls within the reasonable standard of Graham and its progeny. That is especially so given that the undisputed video evidence shows that Trooper Myrdek worked expeditiously to try to handcuff Greeley, the officers ultimately needed to apply two sets of handcuffs to accommodate Greeley's size, Trooper Myrdek recalled Ragnar the moment another officer arrived and was able to secure Greeley, and Ragnar was engaged with Greeley for approximately one minute total. Giving Greeley every reasonable inference and considering the totality of the

[2] Greeley argues that certain perceived discrepancies in the record create a dispute of material fact. For example, he notes that Sergeant Barrett testified at his deposition that he asked Greeley for one of his hands so that he could secure the handcuffs but that a reasonable jury could determine from the video evidence that Greeley already had both hands behind his back when Sergeant Barrett arrived. Doc. no. 24, ¶¶ 10-11. Even if the record created a dispute about the location of Greeley's hands during those 13 seconds, that dispute is not material. There is no question that Greeley was not yet handcuffed.

circumstances, no rational factfinder could conclude that Trooper Myrdek used excessive force be delaying Ragnar's recall. See, e.g., Benfer v. City of Baytown, Texas, No. 4:22-CV-2196, 2023 WL 6465870, at *13 (S.D. Tex. Oct. 4, 2023) ("Plaintiff's encounter with the K-9 also lasted approximately one minute, albeit a bit longer. Accordingly, this Court finds that Officer Calvert allowing the K-9 to continue to bite Plaintiff until he was fully handcuffed was not a use of excessive force."), aff'd, 120 F.4th 1272 (5th Cir. 2024). The defendants are entitled to summary judgment on Count I.

C. Qualified Immunity

Even if there were a genuine dispute as to whether Trooper Myrdek's use of Ragnar was reasonable, he would be entitled to summary judgment based on qualified immunity. Qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Under the qualified immunity standard, officers are immune from suit under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." Hurley v. Curtis, No. 25-1830, 2026 WL 2454228, at *9 (1st Cir. Aug. 21, 2026) (quotations omitted). "The doctrine of qualified immunity leaves 'ample room for mistaken judgments' and protects 'all but the plainly incompetent or those who knowingly violate the law.'" Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) (quoting Malley v. Briggs, 475 U.S. 335, 341, 343 (1986)).

Again, because the court has already determined that Trooper Myrdek did not violate Greeley's constitutional right to be free from the use of excessive force, Trooper Myrdek would

be entitled to qualified immunity on Greeley's claim. But even assuming that there were a genuine dispute of fact over whether Trooper Myrdek violated Greeley's constitutional right, there is no dispute that Trooper Myrdek is entitled to qualified immunity because the unlawfulness of his conduct was not clearly established. This prong of the analysis itself asks two questions: "whether (a) there is controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm; and (b) an objectively reasonable officer would have known that his conduct violated the clearly established law in the circumstances he faced." Conlon v. Scaltreto, 158 F.4th 211, 219 (1st Cir. 2025) (quotations omitted).

As to the existence of controlling authority, "case law makes clear that the question is not whether some right has been established clearly at a highly abstract level, for example, the right to be free from unreasonable searches and seizures. Rather, the question is whether, under the circumstances that confronted the official, 'a reasonable official would understand that what he is doing violate[d] that right.'" Berthiaume, 142 F.3d at 15 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In other words, it "is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quotations omitted). "[T]o defeat a police officer's qualified immunity defense, a plaintiff must 'identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.'" Gray v. Cummings, 917 F.3d 1, 10 (1st Cir. 2019) (quoting City of Escondido, Cal. v. Emmons, 586 U.S. 38, 43 (2019) (per curiam)). "Although such a case need not arise on identical facts, it must be

sufficiently analogous to make pellucid to an objectively reasonable officer the unlawfulness of his actions."[3] Id.

Greeley identifies no such cases. Instead, he argues only that "First Circuit law clearly establishes that officers may not continue or increase significant force after a suspect has stopped resisting or submitted to control." Doc. no. 24 at 14 (citing cases). That may be true in a general sense. But those are not the circumstances presented here. Again, the undisputed evidence in the record demonstrates that Greeley led Trooper Myrdek on a dangerous car chase until he turned onto a dead-end street. He then put his car in reverse, got out while it was moving into the officer's vehicle, and took a few steps indicating an attempt to escape into the surrounding open woods. Following his warning, Trooper Myrdek deployed Ragnar. Trooper Myrdek immediately began the process of trying to handcuff Greeley and he recalled Ragnar as soon as another officer had arrived and Greeley was able to secure Greeley in double handcuffs. Ragnar was biting and holding Greeley for approximately one minute.

Unsurprisingly, Greeley points to no case law, and the court is not aware of any, that holds that an officer is required by the Fourth Amendment to recall a K-9 partner as soon as the plaintiff begins cooperating as the result of the K-9 deployment. Of course, there are cases in which an officer who used the "bite and hold" method with a K-9 partner was not entitled to qualified immunity. Some of the considerations include whether the police officer gave a warning before deploying the dog if it was feasible to do so, the availability of less intrusive means of controlling the plaintiff, and whether it should have been apparent that the person was

[3] A plaintiff need not identify other similar cases "if the conduct was such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful." Heredia v. Roscoe, 125 F.4th 34, 47 (1st Cir. 2025) (quotations omitted). For the reasons described above, that is not the case here.

emotionally disturbed. See, generally, Dastinot v. Watkins, No. 2:18-CV-00166-JCN, 2023 WL 121221, at *6 (D. Me. Jan. 6, 2023) (collecting cases); see also Jacobson v. City of Nashua, No. CIV. 01-165-B, 2002 WL 1349515, at *4 (D.N.H. June 19, 2002) (denying summary judgment on excessive force claim on qualified immunity grounds because although "the 'bite and hold' method employed by [the officer's] dog does not constitute excessive force in all cases, the use of such force on a person sitting passively who complies immediately with a command to show his hands—and who is not reasonably thought to be armed—is unreasonable"). There is no controlling First Circuit or Supreme Court case putting Trooper Myrdek on notice that his conduct would violate Greeley's constitutional rights.

Moreover, even if such precedent existed, an objectively reasonable officer would not have known that his conduct violated the clearly established law in the circumstances Trooper Myrdek faced. Though Greeley was stating his compliance, Trooper Myrdek reasonably believed that Greeley continued to be a threat. As such, Trooper Myrdek is entitled to qualified immunity on Greeley's excessive force claim in Count I, and the court grants the defendants' summary judgment motion on that ground as well.

## II. Evidence Fabrication

Greeley alleges in Count III "that [Trooper] Myrdek provided false testimony at a probable cause hearing in Mr. Greeley's criminal case and that [Trooper] Davis submitted a K-9 incident report falsely indicating that no K-9 deployment had occurred, which [Sergeant] Barrett approved." Doc. no. 5 at 10. The defendants argue that they are entitled to summary judgment both because the undisputed evidence shows that they did not fabricate evidence and that they are entitled to qualified immunity in any event.

> Although the First Circuit has not yet addressed this issue, "every court of appeals that has considered the question of whether a state actor has violated the defendant's right to due process of law by fabricating evidence to charge or convict the defendant has answered the question in the affirmative." Halsey v. Pfeiffer, 750 F.3d 273, 292 (3d Cir. 2014); see also Whitlock v. Brueggemann, 682 F.3d 567, 585–86 (7th Cir. 2012) (collecting cases). And, the First Circuit has emphasized in similar circumstances that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit" and that "[a]ctions taken in contravention of this prohibition necessarily violate due process." See Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004) (affirming the denial of qualified immunity where officers developed a witness for prosecution that they knew "would perjure himself and falsely implicate three innocent men in" a murder); see also Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013); Haley v. City of Bos., 657 F.3d 39, 49–50 (1st Cir. 2011).

White v. Roe, No. 19-CV-1059-SM, 2020 WL 4043647, at *3 (D.N.H. July 17, 2020) (quoting Alvarez v. City of Worcester, 450 F. Supp. 3d 74, 81 (D. Mass. 2020)). "A fabrication of evidence claim requires: (1) fabrication of inculpatory evidence that is (2) material / causal to the conviction and (3) deliberate deception." Weichel v. Town of Braintree, No. 1:20-CV-11456-IT, 2025 WL 1756871, at *6 (D. Mass. June 25, 2025) (quotations omitted).

First, and fatal to the claim, Greeley does not show how any of the supposedly fabricated evidence was material to any charge or conviction. Instead, he argues that "a reasonable jury could find that Defendants created, repeated, approved, or ratified materially false or misleading accounts of the incident in order to justify the force used and shape the official and legal narrative of Plaintiff's seizure." Doc. no 24 at 14. Greeley appears to argue that the alleged falsehoods are relevant to his excessive force claim and not to his criminal charges. Without some connection to his criminal charges, his evidence fabrication claim must fail.

To the extent that Greeley intended to allege fabrication of evidence in the context of his criminal proceedings, the claim still fails. With regard to Trooper Myrdek, the complaint alleges that he "provided sworn false testimony at the probable cause hearing on or around February 28,

2025, that [Greeley] 'got out and ran a few feet then said like 5 feet and then was apprehended by Ragnar.'" Doc. no. 1, ¶ 50. But the undisputed video evidence shows that this testimony was accurate (except, potentially and immaterially, the distance Greeley ran, which was a reasonable estimate). The video shows that Greeley exited his vehicle, took a few steps, and then was apprehended by Ragnar. Greeley argues that this testimony was false because he put his hands up before Ragnar bit him. Although the video evidence confirms that Greeley had his hands raised before Ragnar bit him, Trooper Myrdek's sworn affidavit—which is uncontroverted by any competent evidence—states that Greeley did not have his hands up when Trooper Myrdek released Ragnar.

Regardless, Greeley has not explained how this portion of Trooper Myrdek's testimony was material or causal to his conviction. There was video evidence of Trooper Myrdek's entire interaction with Greeley, from the moment Greeley failed to come to a complete stop at the stop sign until Greeley was handcuffed and Trooper Myrdek recalled Ragnar. Further, whether Greeley raised his hands before Trooper Myrdek released Ragnar had no bearing on the outcome of Greeley's proceedings, and Greeley does not contend otherwise. He pleaded guilty to several crimes, including drug possession, reckless conduct with a deadly weapon, and DUI aggravated attempt to elude police. Thus, the undisputed evidence in the record shows that none of the three elements of a claim for evidence fabrication are present with regard to Trooper Myrdek's testimony. Therefore, Trooper Myrdek is entitled to summary judgment on Count III.[4]

---

[4] Greeley includes with his summary judgment motion a "New Hampshire State Police Use of Force Report" authored by Trooper Myrdek. Doc. no. 24 at 26-28. The report is dated March 14, 2024, and appears to attach Trooper Myrdek's K-9 Incident Report dated that same day. See id. at 26 (stating "See attached" under "Incident Summary."). Greeley notes that the report states "no" next to "citizen injured" but says "yes" next to "citizen taken to hospital." Id. Greeley argues that this report would allow a jury to "find material falsification or deliberate minimization of Plaintiff's injuries." Id. at 12. Putting aside that other than a picture of his torso

So too are Sergeant Barrett and Trooper Davis. Greeley's evidence fabrication claim against those officers rests on Trooper Davis's K-9 Incident Report, which Sergeant Barrett approved. That report, which lists Trooper Myrdek as the K-9 handler and Ragnar as the K-9's name, includes the words "no deployment" under the headings "K-9 Incident Type" and "K-9 Incident Disposition." Doc. no. 1-3 at 6. Greeley alleges:

> The false K-9 Incident Report submitted by Trooper Davis and approved by Sergeant Barrett, which completely denied that any deployment or bite occurred, inflicted additional psychological distress upon Plaintiff. Knowing that the truth of his physical suffering was erased from the official record—and that those responsible would attempt to bury the facts—contributed to feelings of helplessness, humiliation, and betrayal.

Doc. no. 1, ¶ 51.

To be clear, Trooper Davis's K-9 report states: "While attempting to catch up to TFC Myrdek I heard radio traffic from him stating that the pursuit was entering a dead end on Hope Lane in Bow. I then heard traffic from TFC Myrdek stating that he had one in custody from a K-9 apprehension." Doc. no. 1-3 at 6. Thus, Trooper Davis's K-9 report states that Trooper Myrdek had informed other officers that he had apprehended Greeley by using his K-9. And although the report states "no deployment" despite referencing Trooper Myrdek as the handler and Ragnar as the K-9, Trooper Davis asserts in his sworn declaration that he is "trained to complete that section only for our own K-9 partners" and that he stated no deployment because his "own K-9 did not deploy." Doc. no. 16-8, ¶ 7. Therefore, it does not appear that Trooper Davis's K-9 report was false.

---

where Ragnar bit him, there is no evidence in the record regarding Greeley's injuries, the report could not change the outcome of Greeley's evidence fabrication claim against Trooper Myrdek even if it were untruthful. Whether Trooper Myrdek misrepresented that Greeley was uninjured was not material or causal to his conviction.

Nevertheless, viewing the evidence in the light most favorable to Greeley, the court assumes that a reasonable juror could determine that Trooper Davis's report falsely states that Trooper Myrdek did not deploy Ragnar in effectuating Greeley's arrest. Even so, Greeley does not explain how that evidence was material or causal to his conviction. Again, there is video evidence of Greeley's arrest, including Ragnar's involvement. Further, Trooper Myrdek submitted his own K-9 report in which he documents his deployment of Ragnar and the circumstances surrounding Greeley's arrest. Doc. no. 16-5. Finally, Greeley pleaded guilty to several crimes arising out of his arrest and he does not explain the significance of whether a K-9 was deployed during his arrest to any issue in his criminal case.

For those reasons, Trooper Davis and Sergeant Barrett are entitled to summary judgment as to Count III.[5]

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (doc. no. 16) is granted. All other motions are denied as moot. The clerk of court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Samantha D. Elliott
United States District Judge

Dated: September 18, 2026

cc: Counsel of record.

[5] The defendants argue that even if there were a genuine issue of fact about whether they fabricated evidence, they would be entitled to qualified immunity on Count III. Because their arguments essentially rely on their contention that they did not fabricate evidence, the court does not address qualified immunity in the context of Count III.

Richard Greeley, pro se.